HOUSTON TAP AND BRAZORIA RAILWAY COMPANY V. C. H. RANDOLPH, TREASURER, &C.

A petition for a *mandamus*, must show that the plaintiff has a clear right to, and that it is plainly the duty of the officer proceeded against to perform, the thing demanded.

It is a principle at the foundation of our system, that all boards, tribunals, departments, and even the government itself, are creatures of delegated and limited authority, and when the authority delegated is exceeded, their acts are null and void.

The acts of courts of general jurisdiction, are presumed to be within their authority, until the contrary is made to appear; but those of tribunals of limited powers, do not carry with them the same force of presumption.

Warrants issued by the board of school commissioners, to a railroad company, applying for a loan, are conclusive, that it has done the work required by law, and is free from any adverse lien.

But they are not conclusive, that the road is one of those authorized by law to apply for the loan.

A petition by a railroad company, against the treasurer, (if maintainable,) to compel him to discharge warrants issued to it by the board of school commissioners, for a loan, out of the school fund, should show that the company was one of those entitled by law to apply for the loan.

In England, the affidavit in support of the rule for a *mandamus*, should anticipate, and answer every objection which may be urged against it, and this, it seems, should be done here, in the petition.

The cases in relation to the grant of certificates by the boards of land commissioners, are not precisely analogous to this. The main duty of such boards was, to designate the persons entitled to land, and to give them certificates.

But the inquiry by the board of school commissioners, as to the particular company entitled to apply for the loan, is merely incidental, in ascertaining the proper objects for the exercise of their authority.

The treasurer of the State cannot, in his official capacity, be compelled by a *mandamus*, to pay out money, or other effects, in the treasury.

The five per cent. bonds set apart as a school fund, were placed under the control of the treasurer, as an officer of the State, and not as an individual.

The board of school commissioners are authorized, in order to invest this fund, as prescribed by law, to draw upon the treasurer. He acts upon such drafts, not as the servant, or banker of the board, but in his official capacity, and must exercise his official judgment, in determining upon the validity of the warrant, whether the road be one of those entitled to the loan, &c.

If the judicial, could supervise or control the executive department, in the dis-

charge of its duties, it would not be as provided by the constitution, a co-ordinate, but a superior department of the government.

In England, where there is not that well defined limit of power, in the different departments of the government, that exists in this country, the courts cannot intermeddle with the fiscal affairs of the executive department.

The statute of 1846, which provides that writs of *mandamus* against the heads of departments, and bureaux of government, shall be returnable before the : District Court of the county in which the seat of government may be, does not confer on the courts the power to grant the writ.

A statute authorizing the courts to interfere with the executive officers, in managing the fiscal affairs of the State, in their executive capacity, would be a plain infraction of the Constitution.

This statute was, doubtless, intended to obviate difficulties, growing out of writs of *mandamus* being issued against the commissioner of the General Land Office, in suits for land and land locations, instituted in other counties ; upon this custom, as recognised and regulated by the statute, this remedy has been sanctioned against that officer, as to ministerial duties.

That the governor cannot, (as may have been contemplated,) give direction as to the management of affairs, in all the branches of the executive department, because inferior officers of it decline to comply with his wishes, or follow his judgment, will not authorize the interference of the judiciary.

APPEAL from Travis. Tried below before the Hon. Alexander W. Terrell.

This was a petition for a *mandamus* by the appellant against the appellee, C. H. Randolph, Treasurer of the State, and C. B. Johns, the comptroller, to compel the said Randolph, to pay over and deliver to the authorized agent or officer of the appellant, the amount of $150,000, in the United States five per cent. indemnity bonds, belonging to the special school fund, in the treasury of the State, upon the warrant of the board of special school commissioners, appointed to invest the fund in the bonds of railroad companies; which warrant, it was alleged, had been presented to the defendant, Randolph, as treasurer of the State, in whose possession the said five per cent. bonds were, and whose duty it was to pay the said warrant, but that he refused to honor or discharge the same.

The warrant upon which the plaintiff claimed, was signed by the governor and attorney-general, and countersigned by the governor, as required by law; but the comptroller, (the defend-

ant, Johns,) the other member of the board of school commissioners, refused to sign it.

The plaintiff prayed, in the alternative, that if the signature of the comptroller was necessary to perfect the warrant, a writ of *mandamus* should be awarded, commanding him to sign the said warrant.

Upon exception taken, that the two prayers could not be entertained by the court, in the same petition, the plaintiff dismissed as to Johns, and proceeded solely against the defendant, Randolph, relying upon the sufficiency of the warrant without his (Johns's) signature.

The defendant, Randolph, excepted to the petition; his exceptions were sustained, and the petition dismissed.

*Oldham & White* and *E. M. Pease*, for the appellant.

*R. T. Brownrigg*, also for the appellant.—The questions are: 1st. Is the judgment of the board of school commissioners conclusive, when rendered upon application made under the requirements of the law in question? 2d. Is the judgment of a majority of the board, when properly convened, and an adjudication is had, the judgment of the board itself? 3d. Is the treasurer of the State, as *ex officio* keeper of the special school fund, under the provisions of the Act of August 13th, 1856, a ministerial officer, or is he invested with discretion in the premises? It is proposed to discuss each question separately, in the order in which they have been presented.

1st. Is the judgment of the board of school commissioners conclusive, when rendered upon application made under the requirements of the law in question?

The Act of the legislature (see O. & W. Dig., Art. 1681,) constitutes the governor, comptroller, and attorney-general, *ex officio*, a board of school commissioners, to draw from the treasury, and invest this fund, &c. This law, beyond all doubt, constitutes these commissioners a special tribunal, with limited but exclusive jurisdiction. (O. & W. Dig., Art. 1683, 1684, 1685.)

The school fund in the treasury, is the subject-matter of juris-
diction in this court, or board of commissioners; and so long as
there is any portion thereof in the treasury, uninvested, and the
board entertains an application for its investment, the jurisdic-
tion of the board attaches *quoad hoc.* There is no other man-
ner in which the jurisdiction of this board can attach, as its
jurisdiction is entirely of a subject-matter, and not of a person;
"for jurisdiction can be acquired but in one of two modes: 1st.
As against the person, by service of process. 2d. By proceeding
against the property within the jurisdiction of the court." (Bos-
well v. Otis, 9 How. Rep. 336.)

It is true, as a legal proposition, that "when a court of com-
petent (and exclusive, though limited) jurisdiction, has taken
cognisance of a subject-matter, and the jurisdiction has attached
in the particular case, its judgment cannot be questioned in a
collateral inquiry, and, until reversed, it is binding upon all
other courts." (Southerland v. De Leon, 1 Texas Rep. 250,
and authorities there cited; also, Wiley v. Kelsey, 9 Ga. Rep.
117; Ranoul v. Griffie, 3 Md. Rep. 54.) And in Foster v. Wells,
4 Texas Rep. 101, this court held, that "the judgment of a
court of competent jurisdiction, is conclusive and binding upon
the parties, as to all points directly involved and necessarily de-
termined by it; and it matters not whether the tribunal render-
ing it be clothed with limited or general powers;" and that this
is correct, see also, Wales v. Lyon, 2 Mich. Rep. 276; Mobley
v. Mobley, 9 Ga. Rep. 247. The only qualification to this doc-
trine is, that the judgment must be upon the merits, and must
not go off upon a technical defect. Again: "Where a court of
special and limited powers has jurisdiction of the proceeding,
and this appears on the face of the record, its acts will be pre-
sumed to be rightly done." (Raymond v. Bell, 18 Conn. Rep.
81.) "When certain facts are requisite to give an inferior court
jurisdiction, and the evidence in support of such facts has been
adjudged by such court to be sufficient, such judgment cannot
be collaterally impeached or contradicted." (Sheldon v. Wright,
1 Seld. Rep. 497.) In this case, the court held, that in a colla-

teral proceeding, it would not inquire into the matter of the proper exercise of jurisdiction, as it appeared that the court had, and had exercised, jurisdiction. In support of this proposition, is the case of Burdett v. Silsbee, 15 Texas Rep. 604.

The jurisdiction of this board attached as soon as it was ascertained that there were funds in the treasury, remaining to be invested, pursuant to the provisions of the act; and it then became necessary to determine, whether the application came within the requirements of the law. If it did, the 5th section of the act (O. & W. Dig., Art. 1685,) prescribed explicitly the duty of the board. Now, who was to determine whether the application came within the requirements of the act? Certainly the board of commissioners; and if so, were they not to determine each and every question upon which this determination rested? The act makes no discrimination, which invests the board with full discretion as to one fact to be determined by it, and withholds discretion as to another; and the very first fact to be determined, after the jurisdiction of the board has attached, in deciding the sufficiency of the application, is, whether the company making application, is such an one as is entitled to the benefit of the provisions of the act. This is as much a question for the adjudication of this board, as any other possibly can be; 1st. Because there is no other prescribed mode for determining it; and, 2d. Because the charter of a railroad corporation is a private act, pleadable, proveable, and cognisable before a court only as, and *pari passu* with, any other private fact. If this be law, and the decision of our court, in the case of Burdett v. Silsbee, be law, (of which there is no doubt,) then it was the province of this board to decide this point; and, having decided it in favor of the company, its decision cannot be attacked in a collateral proceeding of this character.

The case of Lindsey v. Luckett, 20 Texas Rep. 516, does not affect these positions in the least; (and see Visscher v. The Hudson River Ralroad Company, 15 Barb. Rep. 37; Rice v. Commissioners of Middlesex, 13 Pick. Rep. 225; also, Baker v. Chisholm, 3 Texas Rep. 157; and the opinion of Justice WHEELER, in the case of Arberry v. Beavers, 6 Texas Rep. 469, 470.)

These authorities are conclusive to the effect that "the judgment of the board of school commissioners is conclusive within the scope of its jurisdiction; and that when the jurisdiction had attached, it was within the province of the board to decide all points necessary to the exercise thereof."

The next point to which the attention of the court is invited, is the consideration of the 2d proposition, to wit: "Is the judgment of the majority of the board of school commissioners, when properly convened, and an adjudication is made, the judgment of the board itself?"

Upon this proposition, *the law is clear and positive*, and can be shown in the affirmative, in one unbroken current of authorities, from that able and learned judge, Lord KENYON, down to the present time. (See Withnell v. Gartham, 6 Term Rep. 396.) And in Rex v. Beetson, 3 Term Rep. 592, it was held by the same learned judge, that, "Under a statute which enabled the churchwardens and overseers, with the consent of the major part of the parishioners, to contract for providing the poor, it was not necessary that all the churchwardens and overseers should concur; the contract of a majority of them, bound the residue." (And see Orvis v. Thompson, 1 Johns. Rep. 500.) "For where any number of persons are appointed to act judicially in a public matter, they must all confer; but a majority may decide, though the minority dissent, and refuse to be further considered members of the board." (Ex parte Rogers, 7 Cow. Rep. 526.) See this case also, for an able and lengthy note, fully elaborating this doctrine. (Also, Commissioners of Allegheny County v. Lecky, 6 S. & R. Rep. 166; McInroy v. Benedict, 11 Johns. Rep. 402; Green v. Miller, 6 Id. 39; Case of Baltimore Turnpike, 5 Binn. Rep. 481; Hall v. Canal Commissioners, 9 Watts, Rep. 466.)

The only qualification to the doctrine, as contended for by appellant's counsel, is, "That a power of a *private nature* must be executed by all to whom it is given; but a power of a *public nature* may be executed by a *majority;* and the criterion seems to be, not so much the character of the power, as the character

of the agent appointed for its exercise." (See cases cited, 9 Serg. & Rawle, 466; 6 Johns. 38; 7 Cow. 526, and note before referred to.) The only limitation which any of the authorities impose upon the decision of a majority of such public boards is, that *all must convene*, though, when present, and having conferred together, *a majority may decide*. This court, and every other judicial organization, consisting of a plurality of persons, in this or any other state, is governed by the same principles of law, in the absence of any enactment to the contrary.

It now remains to consider the third and last proposition. "Is the treasurer of the State, as *ex officio* keeper of the special school fund, under the provision of the Act of August 13th, 1856, a ministerial officer, or is he invested with discretion in the premises?"

The 6th section, (O. & W. Dig., Art. 1686,) which prescribes the duty of the treasurer, under the act, reads as follows, to wit: "Upon the presentation of such warrant or warrants, to the treasury of the State, the amount of said indemnity bonds called for in the same, shall be delivered and transferred, according to law, to the president, or authorized agent of said company, his receipt taken therefor, and the same charged to the special school fund." The language of the law is clear, positive and peremptory, that the amount of the bonds called for in the warrant, "shall be delivered," &c. Nowhere in the act does it appear, that the legislature intended to invest the treasurer with any kind or character of discretion in the premises. The statute defining his duty, as treasurer of the State, in paying out money upon the warrant of the comptroller, requires him "to countersign and pay all warrants drawn," &c., "*which are authorized by law.*" (O. & W. Dig., Art. 1883.) Thereby investing him directly with the discretion to determine whether or not the warrant is authorized by law, and to approve and pay the warrant or not, as his judgment may dictate. Now, it would hardly be supposed, but it may be contended by the opposite counsel, as it was in the court below, that this statute, (Art. 1883,) prescribing the treasurer's duties, as such, in regard to his payment of the warrants of the comptroller, drawn upon the money in the treasury, is

also applicable and obligatory upon him, as *ex officio* keeper of the special school fund, in honoring the warrant of the board of school commissioners, drawn in favor of a railroad company, and upon said fund. There can be no analogy or reason in this.

The special school fund is not money in the treasury; on the contrary, it was set apart and created, out of the funds in the treasury, by the Act of January 31st, 1854, (O. & W. Dig., Art. 135,) and has been increased by subsequent enactments. Not a dollar of it can escape from the treasury, upon the warrant of the comptroller, which is the only manner in which *money* can be paid out of the treasury. It is, therefore, idle to contend, that the special school fund is money in the treasury, or that the laws regulating the treasurer's duties, as such, in the payment of money from the treasury, upon the comptroller's warrant, can apply to his duty, as *ex officio* keeper of the special school fund, under the provisions of the Act of August 13th, 1856, for its investment in the bonds of railroad companies, incorporated by the State.

The act in question, evidently regards the investment of the special school fund in the bonds of railroad companies, in the manner which it prescribes, as a simple change of securities, by means of which the special school fund would the more rapidly increase, and the works of internal improvement in the state, the more rapidly progress; with this object in view, the legislature intended, and if a plain, simple and obvious interpretation be given to the language employed, said, that the investment of this fund should be entrusted to a higher and more secure position than the warrant of the comptroller, countersigned by the treasurer; and with that purpose created the board of school commissioners, which is composed, *ex officio*, of the three highest officers of the State government.

The treasurer has no place on the commission, nor is he authorized to countersign or approve anything connected with the investment of the fund; but as *ex officio* keeper of the same, under the provisions of the Act of August 13th, 1856, *he is a purely ministerial officer, invested with no discretion whatever.*

In support of which, the attention of the court is invited to the following authorities: Where the duty to be performed by a public functionary is specific, the writ of *mandamus* is the proper remedy to compel a performance, but where a discretionary duty is imposed, a *mandamus* will only lie to compel the exercise of the discretion, and not to control it. (United States v. Dubuque Co. Commissioners, 1 Morris, Rep. 31; Rex v. Lords Commissioners of the Treasury, 31 Eng. Com. Law Rep. 140; Kendall v. The United States, 12 Peters, Rep. 524; and the case of the Commissioner of the General Land Office v. Smith, 5 Texas Rep. 471.)

Now, there is nothing clearer, than that the legislature did not intend to subject the claim of a railroad company to this loan, to the discretion of the treasurer, as well as the board of school commissioners; for nowhere in the act is it intimated, notwithstanding the treasurer is, *ex officio*, superintendent of common schools, and keeper of the school fund. He is not joined in the commission, nor is there any authority to be found in the act, for him to approve its action, or pass for himself upon its validity. His duties, on the contrary, are prescribed, and they are *plain, simple*, and *specific*. "Upon presentation of such warrant, the amount," &c. No expression can be more *specific* and *positive*. In support of the doctrine, that the board of commissioners are alone invested with discretion in the premises, and that the treasurer's action is purely ministerial; that a *mandamus* does not lie to control the action of the board, and does lie to control the action of the treasurer, see Danley v. Whiteley, 14 Ark. (1 Barb.) Rep. 687; Delaney v. Goddin, 12 Grattan, Rep. 266; Thomas v. Owens, 4 Md. Rep. 189; Inhabitants of Tremont District v. Clark, 33 Maine Rep. 482; also, Kendall v. United States, 12 Peters, Rep. 524.

The case of Manor v. McCall, 5 Ga. Rep. 522, after laying down that a *mandamus* is the proper remedy, in cases such as the one at bar, holds that "the general assembly has seen fit to take from the inferior court, as it had the right to do, its ordinary jurisdiction over these county matters, and confer it on

particular individuals, for its proper exercise, these agents of the public, *pro hac vice,* are answerable to the State, and to public opinion." This seems to suit the view of the case at bar, taken by appellant's counsel.

The legislature had the right, and it was its duty, to take from the treasurer and comptroller, if any they had, all jurisdiction of the special school fund. If no jurisdiction of it existed before, the legislature had the right, and properly exercised it, of creating this commission, and investing it with the jurisdiction. It was a large and sacred fund, and its administration was, and properly, a matter of grave consideration with the legislature. Instead of leaving it to rest upon the discretion of one or two public officers, and each particular investment unsupported by positive enactment, the three highest officers of the administrative government of the State, were associated as a board of commissioners, for its investment—the governor, the comptroller, and the attorney-general, the law adviser of the different departments of the State government. "*For its proper and beneficial administration these responsible agents of the public are answerable to the State, and to public opinion.*"

*Shelley & Carrington,* for the appellee.—It is insisted by plaintiff, that the action of two members of the board of school commissioners, is the action of the board. That such action is final and conclusive, and inquiry into the ground of this action, is precluded in any other forum. That the said board is a tribunal, specially empowered, and exclusively invested with authority, to adjudicate all questions pertaining to the investment of the school fund; and that having acted, as there is no appeal from their decision provided, neither the District Court, nor this court, can inquire behind it.

If we concede, that the board of school commissioners is a tribunal, or court with powers of adjudication, it will not be disputed that its powers are special and limited, and are prescribed by the act creating it, and can only be exercised upon questions, specially referred to it for adjudication.

Houston Tap and Brazoria R. Co. v. Randolph.

If we concede, that the school fund is the subject-matter of jurisdiction of this special tribunal, we must at the same time admit, that the persons to take the fund under the law, must be of a particular class, to be within the jurisdiction of this tribunal; and the jurisdiction of the subject-matter, remains inoperative, until the person to take, is also within the jurisdiction of this board; and before its adjudication can be final and conclusive, it must affirmatively appear, that both the subject-matter and person, are within its jurisdiction.

Every fact necessary to give the tribunal jurisdiction, so as to support it, must be affirmatively shown by the record. (Commissioners' Court of Talladega v. Thompson, 18 Ala. Rep. 694; Id. 484; Id. 757; Weightman v. Kawson, 20 Id. 446.) The existence of a fact, necessary to sustain the jurisdiction, or the judicial ascertainment of its existence, cannot be inferred from the mere exercise of jurisdiction. (Wyatt's Administrator v. Rambo, 29 Ala. Rep. 51.)

In cases of special statutory authority, a tribunal or officer must show that an act done comes within his limited jurisdiction; for if this be not shown, it will be presumed to be without the jurisdiction. (Reeves v. Townsend, 2 New Jersey Rep. 366; 13 Ill. Rep. 432.) The same rule applies to courts of general jurisdiction, in the exercise of special statutory powers. (Foster v. Glazener, 27 Ala. Rep. 391; Id. 663; Wyatt v. Rambo, 29 Id. 510.)

Assuming, for the sake of the argument, as it is so strenuously insisted such is the fact, that the governor, attorney-general, and comptroller, as the board of school commissioners, constitute a *tribunal* for the ascertainment of certain facts, required to be ascertained by the act of assembly empowering them, this tribunal can only take cognisance of that *class* of *facts*, as applied to the particular *class* of *persons*, named in the law from which their power is derived. If they take cognisance of, and pass judgment upon facts, and with reference to parties outside of, and excluded from their consideration and judgment, by the terms of their *statutory authority*, their judgment is a simple

nullity, and may be disregarded by any one, sought to be affected by it.

If resort be had to another tribunal, to enforce this judgment, the court of resort will inquire into the jurisdiction of the tribunal rendering the judgment. (See the case of Lindsey v. Luckett, 20 Texas Rep. 516, 520, which is directly in point; 19 Johns. Rep. 33, 39–43, and cases there cited; 8 How. Rep. 541, 542, 543; 13 Peters, Rep. 499; Shriver's Lessee v. Lynn, 2 How. Rep. 59; Lessee of Hickey v. Stewart, 3 Id. 750; 1 Peters, Rep. 474–477; 8 Johns. Rep. 90, 194, 197; 11 Mass. Rep. 513; 4 Scam. Rep. 371; 3 Id. 107, 108; 4 Peters, Rep. 471, 472; 10 Id. 474–477; 4 Selden, Rep. 254, 259; Kenney v. Greer, 13 Ill. Rep. 432, which is particularly in point, citing authorities above; also Horan v. Wahrenberger, 9 Texas Rep. 313, and cases there cited; 4 Id. 391.)

If, therefore, the court of general jurisdiction, will inquire into the jurisdiction of a court, rendering a judgment sought to be enforced by it, there must be such averments made by the affirmative pleader, as will place the jurisdiction in an issuable position. In case the judgment has been rendered by a court of *general* or *superior* jurisdiction, the presumptions or intendments, will furnish the affirmative averments. But not so, if the tribunal was one of *limited* or *special* jurisdiction. In that case, the presumptions or intendments, negative the jurisdiction, and these presumptions must be displaced by specific affirmative averments. (Horan v. Wahrenberger, 9 Texas Rep. 313, 320, and cases cited.)

The act providing for the investment of the special school fund, mentions definitively and descriptively, the *class of applications* for the loan of the fund, of which the board of school commissioners shall take notice; and as a legal sequence, excludes those not falling within the class mentioned, from their consideration. If they acted in favor of one of those excluded, their act *exceeded* their authority, and was without their jurisdiction, and the act was a nullity. Whether they did so act or not, must be made issuable by the averments in plaintiff's peti-

tion. If it be not so made, the petition is defective for want of material allegations, and the demurrer should therefore be sustained upon this ground.

We will state another proposition, which we think cannot be controverted, and which will be sustained upon principle and authority; that even a ministerial officer cannot be compelled by *mandamus* to do a ministerial act, which if done, would be illegal, or the consummation of an act unauthorized by law. And in order to the determination by this court, whether the *mandamus* should be awarded, the inquiry is of necessity involved, as to whether the drawing of the warrant was authorized by law; for if unauthorized, the payment of the money upon it would be but the irrevocable and unalterable consummation of the unauthorized drawing.

ROBERTS, J.—This is a proceeding, by *mandamus*, instituted in the District Court of Travis county, to compel the treasurer of the State to satisfy a warrant, to him directed by the governor and attorney-general, being two out of the three officers composing the board of school commissioners, in favor of the Houston Tap and Brazoria Railway Company, for $150,000 of the five per cent. stock, belonging to the special school fund, in the treasury of the State. The petition, being excepted to generally and specially, was dismissed by the District Court.

The main ground of dispute as exhibited in the arguments of counsel is, whether or not, the plaintiff has shown in the petition a *right to the bonds* as a loan. It is well settled, that to entitle a party to the extraordinary remedy of *mandamus*, the petition must state facts, which show, if true, that the plaintiff has a clear right to the performance of the thing demanded, and that it is plainly the duty of the officer proceeded against, to perform such thing.

On the part of the plaintiff, it is contended, that the right is fully shown, by its being alleged that plaintiff is a legally incorporated railroad company in this state; that it made application to the board of school commissioners for the loan; that

said board acted on their application, all of the members of the board being present and deliberating thereon; and that a majority of the said board decided in favor of the application, and signed and delivered the warrant to the president of the company.

On the part of the appellee, it is contended, that as all railroad companies in the state are not entitled to apply for and obtain a loan; and as the board of school commissioners is a tribunal of special limited powers, it should have been shown, otherwise than by mere inference from the warrant, that the plaintiff belonged to the class of railroads, entitled under the law to apply for and obtain the loan.

It is not to be denied, that the legislature did not intend to grant the power to the board, to extend a loan to all railroads, indiscriminately. The act first creates the board, to draw and invest the fund. Next, it directs that it shall be loaned to legally incorporated railroad companies, in this state; that is, to railroad companies in the state, and not out of the state; and to railroad companies, and not to mere individuals. It then points out the class of railroad companies, to whom the board shall be authorized to loan the five per cent. bonds, belonging to the special school fund. They are such as had been chartered before the passage of the act of 13th August, 1856. (See section 3.) In the 15th and 16th sections of the act, certain railroad companies, whether chartered before or after the passage of the act, are excepted out of, and excluded from, the provisions of the act; as any road entitled to receive more than sixteen sections to the mile, and branch roads, &c.

Thus, the particular class of companies, who are entitled to apply for, and obtain the loan, are clearly defined. No others are entitled to apply. The board is furnished with no particular means of information, or proof, by which to ascertain whether or not any particular company that may present itself, is one of the favored class. They must act on their own knowledge, or on such reliable information as they can get. The law seems to take it for granted, that the facts, which constitute the test of its right to apply to them, are so obvious and notorious, that

no special means have been indicated, to ascertain them. "Upon the application of any *such* railroad companies, to said board of commissioners, for said loan, and its representations that section fourth of this act has been complied with, (this has reference to their having completed twenty-five miles, and graded twenty-five miles more, &c.,) said board of commissioners shall appoint some competent engineer, who shall, at the expense of the company, examine the road of said company, and make a full report upon the condition of the same, under oath, and shall report all matters pertaining to the business of said company, which he may deem useful to said commissioners, in ascertaining the true condition of said road and company. And, upon being fully *satisfied* that any section, or sections, of said road, have been constructed and completed, as provided in the fourth section of this act, and that said section or sections are not subject to any lien whatever, other than such as may be created by this act, in favor of the State, said board shall draw a warrant, upon the treasury of the State, in the name of said company, against said special school fund, for such amount of said bonds as it may be entitled to, under the provisions of this act; which warrant shall state on account of what work it is drawn, and shall be signed by said board of commissioners, and countersigned by the governor, and delivered to the president, or duly authorized agent of said company." (O. & W. Dig. 373, § 5.)

Only *such* companies, and not every company, has a right to apply for the loan. It is not required, in the application, that it should be represented that the facts exist, which make the applicant one of the favored class of companies, by its charter being granted before the passage of the loan act, &c. That, however, must be settled by the board, in its own way, before it can entertain the application, and take the first step in the matter, by appointing an engineer. If it be not *such* a company, they are not bound to take this incipient step at all, for it is not intended by the act that they shall extend a loan to any other. After the report of the engineer is presented, what are they to pass judgment upon? of what are they to be "satisfied," to en-

title such road to the loan? Not that the company is *such* company of the class entitled to apply; for that has been settled as a preliminary question. But that such company has done the work required, and that there is no adverse lien. These are the subjects of investigation and judgment, when a proper company has applied to them. Their judgment, on these subjects, is conclusive and final. But whether or not, a *proper company has made the application*, so as to call into exercise the powers delegated to the board, though it must be determined, their determination on that subject, may not be final and conclusive. If, by mistake or otherwise, they should grant a loan to a company, entitled to receive more than sixteen sections of land, or to a branch road company, it would be made to a company not entitled to receive it, by the plain letter of the statute. It would be an exercise of power, not only not granted to them, but expressly, by law, prohibited. It would simply be determining and acting on a case, not comprehended within, but excluded from, the scope of their delegated authority.

In this country, all public boards, tribunals, courts, departments of government, and even governments themselves, are the creatures of delegated and limited authority. When the authority delegated is exceeded, the act done is null and void. None of them are, therefore, the exclusive judges of the extent of their own powers. If they were, they might assume all power. Each tribunal must judge of the extent of its power, whenever it acts at all. Still, other tribunals, when its action is sought to be enforced, may also judge of the extent of its power, and whether or not it has been exceeded in the performance of the act. This principle lies at the foundation of our system of law and government; and fixes a limit, and raises a barrier to *usurped* authority. The confusion and anarchy consequent upon a capricious, unfounded and frequent refusal of obedience to authority, on account of its supposed excessive exercise, should admonish to great caution in asserting this right of judging where authority has been exceeded. But an abandonment of the right of refusal

of obedience to usurped authority, would break down all the limits, by which power is circumscribed.

The acts of courts of general jurisdiction, are presumed to be within the jurisdiction of the court, until the contrary is made to appear. The acts of tribunals of special limited powers, do not carry with them the same force of presumption. Of them, it may be said as a general rule, that their power to do the act must be made to appear by something else than the act itself. (Mills v. Martin, 19 Johns. Rep. 7; Norwood v. Cobb, 15 Texas Rep. 500; Cox v. Thomas's Administratrix, 9 Grattan, Rep. 323; Lindsey v. Luckett, 20 Texas Rep. 516.)

This board of school commissioners being a public board of commissioners, of special limited authority, we incline to the opinion that the petition for *mandamus* should have stated such facts, in addition to what was alleged, as would have shown that this company belonged to the class that is entitled to apply, and capable of applying for and receiving the benefit of the loan.

The rules of pleading, as applicable to the remedy of *mandamus*, require the right of the plaintiff to be stated unreservedly, fully and clearly. In England, the right is shown in the affidavit offered on the motion in support of the rule, and there it is laid down, that " the affidavit should also anticipate and answer every possible objection or argument in fact, which it may be expected will be urged against the claim." (1 Chit. Gen. Pr. 808.) The rule as laid down by the late Chief Justice is, that "the circumstances under which the applicant claims the right, should be positively and distinctly stated, and objections which might be anticipated should be met and answered." (Cullem v. Latimer, 4 Texas Rep. 331; 5 Id. 480; 6 Id. 473.) The object of such strictness is, that the court shall be fully satisfied of the propriety of the exercise of this extraordinary remedy, in requiring an officer to do what, notwithstanding his official obligation, he has refused to do.

The cases in relation to certificates and grants by boards of land commissioners, and other officers, we do not deem exactly analogous. The main object of creating boards of land com-

missioners, was, to designate *the persons* entitled to land, and to give them a certificate, which should be evidence that they had been thus designated as the persons entitled. That was the very matter which the law required the board to receive evidence upon, and it prescribed the character of proof, as well as what should be proved, in order to enable them to determine that fact. Hence the certificate was held to be conclusive evidence that the person designated by it was entitled to the land.

A careful examination of the statute creating the board of school commissioners, it is believed, will establish the conclusion that the inquiry as to the particular company entitled to apply for the loan, was merely incidental, in ascertaining the proper objects for the exercise of their authority. It was the act of passing upon the extent of their power, of which they must judge in the first instance, as every tribunal must, when it acts at all, but of which they are not the sole judge, and therefore it is not conclusively established by the warrant issued by them. The warrant conclusively establishes, that the required amount of work has been done on the road, and that there is no adverse lien,—no more.

It is deemed proper to mention, that the charter of the company is not set out in the petition, and that, therefore, it does not appear to us upon what evidence, as to the plaintiff's right, the board acted in granting the warrant.

There is another objection to this suit, a consideration of which has rendered us content with the general views here advanced upon the question, contested with no inconsiderable research and ability by the counsel for the parties. The objection referred to is, that the District Court of Travis county, has no right to issue a writ of *mandamus* to the treasurer of the State, requiring him, in his official capacity, to pay out the money, or other effects, of the treasury of the State.

By the Act of 1854, $2,000,000 of the five per cent. bonds of the United States, were set apart in the treasury of the State, as the special school fund. (O. & W. Dig. 60.) By the Act of 1856, the governor, comptroller and attorney-general, were con-

stituted, *ex officio*, a board of school commissioners; and it was made their duty to draw said fund from the treasury, and invest it, as provided by that act. (O. & W. Dig. 372.) This fund, thus set apart, remained in the treasury of the State, as a part thereof, under the control of the treasurer, as an officer of the State, and not in his individual capacity. This fund can be drawn out for investment, only by the drafts of the board drawn on the treasury. (O. & W. Dig. 373, §§ 1, 5, 6.) The board entitled to draw it from the treasury, is constituted by adding to the comptroller, the governor and attorney-general, thus combining the three highest executive officers of the State, to unite their wisdom and integrity, in the investment of this fund. They are entrusted with it, *ex officio*, and because they are the chief executive officers of the State ; and as such officers, perform their duty in this commission. The treasurer is bound to recognise their authority to draw upon this fund, as he does that of the comptroller, in ordinary cases. Ordinarily, he cannot pay out money except upon the "warrants of the comptroller of public accounts on the treasury, which are authorized by law." (O. & W. Dig. 410.) Under the statute for the loan of the school fund, this board is authorized to draw upon the treasury, and when the treasurer acts upon such draft, it is in his official capacity, as treasurer of the State, and not as mere servant or banker of the board. (O. & W. Dig. 374, § 6.) His action on the draft being then an official act, as treasurer of the State, the District Court of Travis county, has no right to control or direct the treasurer in relation to it.

This results necessarily from the structure of our State government. The second article of the Constitution provides, that "the powers of the government of the State of Texas, shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit, those which are legislative to one, those which are executive to another, and those which are judicial to another ; *and no person, or collection of persons, being of one of those departments, shall exercise any power, properly attached to either of the others*, except in the

instances herein expressly permitted." (O. & W. Dig. 14.) Here
is a direct prohibition of the blending of the departments. It
contemplates that the persons employed in each department, will
be wise enough, and honest enough, to discharge the duties
entrusted to them, without the aid or interference of the others.
And it is a full warrant for each department to disregard and
repel such volunteer and unauthorized aid and interference.
For, as before said, each one of these departments acts under a
delegated limited authority, and if one exceed its authority,
by usurping powers not belonging to it, its act is a nullity, not
binding upon the other departments, and may be totally dis-
regarded by them.

If the governor were to dictate to the judges the judgments
to be pronounced, and enforce obedience, by his power over the
militia, the usurpation would be startling, indeed, and too plain
for discussion; not any more so in principle, however, than for
the District Court of Travis county, or the Supreme Court of
the State, to require, by its mandate, that the governor of the
State shall sign a patent to land, or the comptroller shall audit
an account, or the treasurer of the State, shall pay a draft upon
the treasury.

If the legislative department exceed its authority, and assume
to adjudicate the disputed rights of parties, it vests no right, and
is repudiated by the judiciary, when a right is sought to be based
on such act in a trial at law, or in equity. Still this is no more
an assumption of undelegated power than judicial legislation.

The officers of each department are chosen by the people, with
reference to their capacity and general fitness to discharge
the peculiar duties of that department. They have a right to
expect, that the respective duties allotted to each department
shall be performed by those they have chosen to perform them.
They would be not a little surprised to find, that all the chief
executive officers, the governor, and heads of departments, elected
by the whole people of the State, were summoned before the Dis-
trict Court of Travis county, and required there to contest the
propriety of any of their official acts, done within the scope of

their authority, and perchance, after a tedious struggle, the facts in issue being tried and determined by a jury of twelve men, citizens of Travis county, *compelled*, under the penalty of attachment and imprisonment for contempt, to do an act, which they had refused to do, acting under their oath of office, and under a sense of responsibility to their constituents. If the court assumes to act, it must carry out its judgment. What is the consequence? The governor is required to sign a patent to land. It is a mere ministerial act by writing his name; the right of the plaintiff has been made clear in the District Court; and the reasons given by the governor for his refusal, are not deemed sufficient by the district judge. The governor, under a sense of duty, and to resist aggression upon his official rights, is obstinate, and will not obey the mandate of the court,—will not write his name officially, as " Governor of the State of Texas," *upon compulsion;* the sheriff of Travis county must enter the governor's mansion with his *posse*, and take possession of the governor, and put him in jail, and keep him there, until he will write his name upon the land patent.

If some of the numerous creditors of the State, (and numerous they may be, if they are not now,) are refused payment of their demands at the treasury, they may send the comptroller and treasurer of the State, to keep company with the governor. But suppose that, actuated, by our traditional veneration for the law, and those who administer it, these high functionaries of the executive department, yield their judgment, obey the mandate, sign the patent, settle the account, pay the claim out of the treasury; who administers the government, they, or the district judge? Who " takes care, that the laws are faithfully executed;" the governor or the district judge? Surely not the governor, if he must obey the mandate of the court, in the performance of an official duty.

This remedy is not permissible in any case, unless the duty of the officer, to do the act required is plain, in the opinion of the court. Now, if the duty be plain, why should we not suppose, that these high executive officers, are as capable of discerning it,

and as anxious to do their duty, as the district judge, or any other judge or court. They have equal if not much greater, means of ascertaining the true facts of the case; they have a legal adviser; they are selected for their judgment and discretion in such matters; their sense of duty is equal; they equally act under an oath of office; why not then consider their judgment final upon the matter, rather than give an appeal to a co-ordinate department? A recognition of such appeal, would render the judiciary not co-ordinate, but superior, to the executive department; contrary to the plain design of the Constitution of the State.

The act which it is sought to force the treasurer of the State to perform, in this case, is said to be purely *ministerial*. If it be meant by that term, that the act is required of him by law, individually, and not officially, the proposition cannot be acceded to. The act is not only official, but it requires the exercise of his judgment, as an officer. When the draft was presented, he should ascertain that it was presented by " the president, or authorized agent of *said* company, so that .if he satisfied it, it should be to the right person, and a proper receipt taken therefor." (O. & W. Dig. 374, § 6.) He should see that the warrant was "authorized by law." (O. & W. Dig. 410, § 3.) Upon looking to the law, authorizing the warrant, several considerations might present themselves, but one certainly, he would have to pass his judgment upon, which is, the legal sufficiency of the warrant, signed by the governor and attorney-general, and not by the comptroller. It is not contended, that the warrant would be valid, unless the comptroller had participated with the other members of the board, when the claim was acted on by them. This was matter of fact to be ascertained. So that here was presented to him, for his judgment in determining his action, an important question of law, as well as one of fact. Again, the state of the funds would have to be examined into, to ascertain whether there was sufficient to satisfy the warrant, so as not to entrench upon the one million of bonds, appropriated to that portion of the State, east of the Trinity river. And as preliminary to this inquiry, he would first have to ascertain, that this rail-

road was located west, and not east of the Trinity river. (O. & W. Dig. 372, § 2.) Again, he must ascertain the correct value, including premium, of the said bonds, and agree with the president, or agent of said company thereon, and determine what amount of the said bonds, will be equal in value to the amount of the warrant, $150,000. (Id.) And another question, graver than all these might have been presented to his consideration, and upon which he would have to decide for himself, as an officer, and that would have arisen, if he had believed and been clearly satisfied that this company, in whose favor the warrant was drawn by a majority of the board, did not belong to that favored class, entitled to apply for a loan, but to that class prohibited expressly by the act, from being capable under any circumstances, of receiving it.

These, involve important considerations, calling into requisition, his financial information, his careful examination into facts, and the law, pertaining to his duty in the matter, and furnish a clear insight to the wisdom of the Constitution in protecting an officer, specially chosen for the performance of such duties, from the interference and control of any other department, or officer thereof, whose business leads in a different direction, and who have not been chosen, with reference to their fitness for any such duties.

This is an isolated case, while the State is not in debt, and has plenty of means on hand, to meet promptly the demands against it. But suppose the case of a State under great embarrassments in its fiscal affairs, with an empty treasury, and only occasionally replenished by annual taxation. The best financial talent of the country is called into requisition, to disenthrall its finances. The monetary affairs of the State, must be managed somewhat like a prudent man manages his own business. Meritorious creditors must sometimes be postponed, although there be some money in the treasury. For the wheels of government must not stop. A fund must be reserved for anticipated exigencies, which cannot be dispensed with. Now, subject this financial officer of the State, to the supervision

and control of a court, as to when money shall be paid out, and when not, and the consequences can be better imagined than expressed.

It should have been before remarked, that the acts creating, setting apart, and vesting this fund, treat these bonds as money in the treasury, to be paid out at their current value, (though not below par,) as gold or silver coin. Nor is it perceived that it would make any difference in principle, whether it was treated as money to be paid out, or convertible government securities, to be exchanged for the bonds of a railway company. In either event, it would be means in the treasury, under his control, as a part of the treasury of the State, and subject to be drawn from it, as money is. And whether this transaction be regarded as a payment of money, or an exchange of securities, it involves equally official action, requiring the exercise of his judgment, in reference to what is under his care, not individually, but as treasurer of the State.

An abundance of authority is to be found for the position, that the writ of *mandamus* cannot be granted in this case. In England, "it is clearly settled, that the writ of *mandamus* cannot, in any case, be granted against the king or queen, both because there would be an incongruity in the soveroign commanding itself, and also because disobedience to the writ must be enforced by attachment. Neither will the writ lie to command the officers of the crown, as such. Thus it does not lie to command the crown, or its servants, strictly as such, being the depositories of public money, &c., either to pay over money in their possession, in liquidation of legal and valid claims, or to deliver up goods wrongly detained." (Tapping's Mandamus, 161, 162.)

Mr. Tapping, in reference to lords of the treasury, says: "that notwithstanding a legal right be shown to something, over which the lords of the treasury, as such, have control, yet a *mandamus* cannot properly issue to them in respect thereof." (Id. 315.) Again he says: "the writ does not lie to command the commissioners of customs, &c., although they act wrongfully by withholding goods, or by doing any other tortious act, for to

grant a *mandamus* in such case, would be in effect to grant the writ against the crown, which legally cannot be." (Tapping's Mandamus, 164.) Thus in England, where there is not the same well defined limit of power in the different departments as in this country, the courts are not allowed to intermeddle with the official management of the fiscal concerns of the executive department.

This question has been several times before the Supreme Court of the United States. In the case of Kendall v. The United States, it was held, that the writ should issue to compel the Postmaster-General to enter a credit upon an account, according to the finding of an arbitrator, as directly required by act of congress. It was put upon the ground of its being a purely ministerial act, not requiring judgment, and not partaking in any respect, of an executive character. (12 Peters, Rep. 609.)

The same court, in later decisions, have exhibited an anxiety to hedge round even this exercise of power, so as to confine it in the most narrow limits. In the case of The United States v. Guthrie, they say, that "the power of the courts of the United States, to command the performance of any duty, by either of the principal executive departments, or such as is incumbent upon any executive officer of the government, has been strongly contested in this court; and, in so far as that power may be supposed to have been conceded, the concession has been restricted by qualifications, which would seem to limit it to acts or proceedings by the officer, not implied in the several and inherent functions or duties incident to his office; acts of a character rather extraneous, and required of the individual rather than of the functionary." (17 How. Rep. 303, 304.)

In this case, so far from the act requiring anything of the treasurer, individually, it does not refer to him as "treasurer," otherwise than by saying that the board shall "draw from the treasury," the special school fund, &c. ; and they shall "draw a warrant upon the treasury of the State," &c., and by such mode of expression, precluding the possibility of supposing that any act was required of him as an individual rather than as a func-

tionary. That court, it is believed, would not order money to be paid out of the treasury, however plain the right of the claimant, nor any other official act to be done, which was not required of the individual rather than the functionary. (Brashear v. Mason, 6 How. Rep. 101; United States v. Guthrie, 17 Id. 303, 304; Decatur v. Paulding, 14 Pet. Rep. 516.)

In the case last cited, Justice CATRON seems to appreciate the difficulty of recognising any right in the courts to call upon the heads of departments to answer at all in relation to any official act, and boldly takes ground against it altogether. He asks, "Is the country known that submits the administration of its finances to the courts of justice, or permits them to control the operations of the treasury?" The fact that there is no such country known, is strong evidence of the utter impracticability of such a system.

We have an authority against this assumption of power, in the case of Auditorial Board v. Arles. This was a suit by *mandamus*, to compel the "auditor and comptroller of the State to receive, and allow interest on, a claim that had been previously received by them as the auditorial board; but the interest on the said claim had not been allowed." The writ had been granted, and upon appeal, the judgment of the District Court was reversed. Justice LIPSCOMB, in delivering the opinion, says: "it is an admitted rule, that the State cannot be sued only by its own permission, and then in the way it has consented to be so sued. To sustain the judgment in this case would be, in effect, to sustain a suit against the State, without its consent." (15 Texas Rep. 75.) This would apply with equal force to the present case.

It is true, we have a statute passed in 1846, which provides, that all writs of *mandamus*, sued out against the heads of any of the departments, or bureaux of government, shall be returnable before the District Court of the county in which the seat of government may be." (O. & W. Dig. 108.) This statute was passed, doubtless, to obviate the difficulty, which had grown out of the practice of seeking the writ of *mandamus* against the

commissioner of the General Land Office, in suits for land and land locations, instituted in the counties all over the state.  And upon this custom, as recognised and corrected by this statute, the remedy has been sanctioned, in its application to the ministerial duties of the commissioner of the General Land Office. (Com. Land Office v. Smith, 5 Texas Rep. 478.)

This statute does not seek to confer the right to grant the writ, but rather takes for granted the existence of the power. If a statute had been passed, giving the right to the courts, to the extent of interfering with the powers of the executive officers, in managing the fiscal affairs of the State, in their executive capacity, it would have been a plain infraction of the Constitution of the State.  The matters settled in Auditorial Board v. Arles, above referred to, arose, and were determined, after the passage of this act.

One other feature in this case, will be adverted to.  The governor has manifested his wish, that this act should be performed, by joining with the attorney-general in signing the warrant. He is the head of the executive department of the State, and it is made his duty, by the Constitution, to "take care that the laws be faithfully executed." . It is evidently contemplated, that he shall give direction to the management of affairs, in all the branches of the executive department.  Otherwise he has very little to do.  Where he has the power of removal, he can assume authoritative control absolutely, in all of the departments. This being the case in the United States government, results in the entire unity of its executive department.  The absence of that absolute power of the chief executive in this State, must occasionally produce a want of harmony in the executive administration, by the inferior officers of that department, declining to comply with the wishes, or to follow the judgment of the governor.  That is an inherent difficulty in the organization of that department, and the conflicts arising out of it, cannot be adjudicated or settled by the judiciary.  The fact that there is no remedy for an injury growing out of such conflict, cannot justify another department, to wit, the judiciary, in overstepping

the boundary of its prescribed authority, for the purpose of furnishing a remedy. The other department, the legislative, may be able to furnish a remedy. The judiciary act on past facts. The legislature acts by devising for the future. It is the peculiar province of the legislative department, to shape future events, so as to obviate and remedy, the jars and difficulties of the past.

We are of opinion, that the court below did not err in dismissing the petition, and therefore the judgment is affirmed.

Judgment affirmed.